# E. R. FAY & CO.

## v.

## ISAIAH STRAWN.

1. BANKERS — *collections through their correspondents.* Strawn placed in the hands of Fay & Co., bankers at Ottawa, a draft on certain parties in Chicago, to be sent by Fay & Co. to Burch & Co., bankers at the latter place, for collection, the proceeds to be returned by express to Fay & Co., who were to incur no liability. The draft was sent with instructions as agreed upon. Burch & Co. collected the draft, and three days afterwards, the money still being in their hands, failed and made an assignment. *Held,* there being no negligence shown on the part of Fay & Co., they could not be made liable to Strawn.

2. AGENCY *in such case.* Under the circumstances mentioned, Burch & Co. became the agents of Strawn, the owner of the draft, and not of Fay & Co., who forwarded it as agreed upon.

3. MISTAKE — *who to be affected.* The fact that Burch & Co. placed the proceeds of the draft to the credit of Fay & Co., by mistake and contrary to their directions, could not affect the liability of the latter.

4. NEGLIGENCE — *want of notice.* There was no negligence on the part of Fay & Co. in their omission to take steps to correct the mistake in passing the money to their credit, as it did not appear they had notice of the mistake until they heard of the failure of Burch & Co.

5. NEGLIGENCE — *where diligence would be unavailing.* Nor were Fay & Co. guilty of negligence in failing to write to learn why the money was not sent as directed, as, in consequence of the short time, only two days, between the collection of the draft by Burch & Co. and their failure, such a course could have availed nothing.

6. NEGLIGENCE — *where a party acts upon common repute.* Neither was there negligence in sending the draft to an irresponsible banking house for collection, because at the time the character of Burch & Co. for solvency was good at Chicago, where they were doing business, and it did not appear that Fay & Co. had any sufficient reason to believe the contrary.

7. USAGE — *proof of, when allowable.* Proof of usage can only be received to to show the intention or understanding of the parties, in the absence of a special agreement.

APPEAL from the County Court of the County of La Salle; the Hon. P. K. LELAND, judge, presiding.

Isaiah Strawn, on the 9th day of January, 1862, instituted an action of assumpsit in the court below against E. R. Fay

& Co., bankers in the city of Ottawa, for the recovery of five hundred dollars, the proceeds of a bill of exchange for that amount, drawn by the plaintiff, Strawn, upon Neely, Lawrence & Co., of Chicago, and placed in the hands of the defendants for collection. The circumstances under which it is sought to hold the defendants liable, will be understood from the pleadings and evidence.

The declaration contained three counts; in the first it is alleged, that Edwin R. Fay, James C. Reed, and Amory W. Hobert, defendants below, are partners under the firm, name and style of E. R. Fay & Co.; that on the 29th day of May, 1861, the firm of Neely, Lawrence & Co., of Chicago, Illinois, were indebted to plaintiff below in the sum of $500; and that defendants, being then engaged at Ottawa in the business of exchange banking and making collections under the firm name of E. R. Fay & Co., said plaintiff then and there employed said defendants to collect for him and his (said plaintiff's) use, of said Neely, Lawrence & Co., said sum of $500; and for that purpose plaintiff made his bill of exchange and delivered it to the defendants in words and figures as follows:

" $500. OTTAWA, May 29, 1861.

" At sight, pay to the order of E. R. Fay & Co. Five Hundred Dollars, value received, and charge the same to account of ISAIAH STRAWN.

" To Neely, Lawrence & Co., Chicago."

That defendants received said bill, and in consideration for a reasonable reward in that behalf, undertook to collect it and render a just account of the same to the plaintiff, when collected; that said defendants indorsed and delivered said bill of exchange to I. H. Burch & Co., of Chicago, which indorsement is in the words and figures following: " Pay I. H. Burch & Co. or order, — E. R. Fay & Co.;" that said I. H. Burch & Co. afterwards, to wit, on the 29th day of May, 1861, presented the same to said Neely, Lawrence & Co. for payment, which was duly paid, and said Burch & Co. received the said $500 for and on behalf of said E. R. Fay & Co.; that the said plaintiff, after the payment of said $500 to said Burch & Co.,

to wit, on the 8th day of January, 1862, and on divers other days before that time and since the payment of said money to said Burch & Co., at the banking house of said defendants in Ottawa, requested the said defendants to pay said plaintiff said sum of $500.

The second count was the same, except the averment that said E. R. Fay & Co., on said 29th day of May, 1861, "in consideration that the said plaintiff, at the special instance and request of said defendants, would employ them, said defendants, to collect said sum of $500," &c.

Third, the common count for money had and received.

The defendants pleaded the general issue, under which all the testimony was allowed to be given.

It was admitted by the defendants that Neely, Lawrence & Co., the drawees, paid the draft to I. H. Burch & Co., on the 31st of May, 1861. It also appears that Strawn, the plaintiff, made a demand in writing of the money from the defendants, in the January following, and payment was refused.

*James W. Fay*, who was the bookkeeper of the defendants, in May, 1861, testified on behalf of the plaintiff, that the draft in question was received of Strawn for the purpose of collecting only. Upon his cross-examination he testified as follows: I had two conversations with the plaintiff about sending the draft; one was about two weeks before the draft was sent and the other about a week before. Strawn wanted to know if we could cash a draft of $500 on Neely, Lawrence & Co., of Chicago; I told him we could not; Fay & Co. were short of currency; that in the then unsettled state of currency they did not want to do any business of that kind. At the last conversation, Strawn wanted a part of the money on the draft; I told him Fay & Co. would not give him any money on it; that he had better wait until the currency became more settled; that we would write to Neely, Lawrence & Co. for him and find out what kind of currency he could get; that, if it would be any accommodation to him, we would send the draft for collection to I. H. Burch & Co., our correspondent at Chicago. It was particularly understood by Strawn at the time of the

38

last conversation, that if we sent the draft for him, the same money collected of Neely, Lawrence & Co. should be returned by express, and that the same money should be handed over to Strawn in a package. The reason of this was, that we did not wish to take any risk or responsibility on account of the depreciation of the money. I told him we would do that for him, and that we would incur no liability in the collection of the draft in consequence of the bad state of the currency. I was not present when the draft was delivered. It was about a week after the above conversation. I saw the draft on the 29th of May. I mailed it to I. H. Burch & Co. on that day. We sent a letter with the draft.

It is the usual way for bankers, when they receive a draft for collection at a foreign place, to send it to their correspondent at the place of the residence of the drawee.

The plaintiff knew that I. H. Burch & Co. were our correspondents at Chicago. We had made one collection for the plaintiff about six weeks or two months before, of Neely, Lawrence & Co., through Burch & Co. In that case we ordered the money to be placed to our credit. That draft was sent by mail also.

These two transactions were the only deal we ever had with Strawn. There was no charge made by us against Strawn for collecting the money.

There appears a credit to Strawn in his pass-book in which his bank account with Fay & Co. was kept, of $1,500; but that was for the money collected on the first draft, and was all paid over to Strawn. Fay & Co. never gave Strawn any credit for the $500 draft.

On the 29th of May, 1861, Burch & Co. were, by the public, considered perfectly good. About six or eight days before the draft was sent, I was in Chicago, and took pains to inquire of a number of business men as to the situation of Burch & Co., and the general opinion seemed to be that they were among the safest and most reliable bankers in Chicago. Fay & Co. had some $1,200 or $1,500 credit with Burch & Co. when they failed, and they have not received anything on the same.

Strawn had overdrawn his account on the $1,500, three dollars and eight cents. Fay & Co. did not receive any notice of the collection till a week or ten days after the failure. The same day we heard of the failure, Mr. Hobert went to Chicago to see what could be done with our funds in Burch & Co.'s hands. They sent us an account current, about the middle of June, in which Fay & Co. were credited with the $500 paid by Neely, Lawrence & Co. to Burch & Co. The reason Fay & Co. did not want to send the draft, was, that they did not want the currency on hand; they had more in Chicago than they wanted. It was in stumptail times, and what was good one day was thrown out the next. Strawn came to Fay & Co.'s office some time after the failure of Burch & Co., and wanted to know what we thought about the chances of Burch paying anything. He never made any demand of Fay & Co. for the money to my knowledge, until the demand made by Milton Strawn on the 28th January, 1862.

On his re-examination by the plaintiff, the witness stated: We did not hear of the money having been paid to Burch until after the failure, which occurred on the 3d of June, 1861. I was not in the office when the draft was received from Strawn for collection. I do not know what the final arrangement was as to its collection. The plaintiff was engaged in the business of buying grain at the time the draft was drawn.

The plaintiff introduced several witnesses, from whose testimony it appeared that the usual course of doing business by Fay & Co. and other bankers in Ottawa, was to receive drafts for collection and credit the party at once with the amount, and to pay his checks for the same. From the testimony of other witnesses, it was shown that such custom did not prevail in the winter and spring of 1861 — that during the money panic of that season there were no fixed rules about doing banking business.

Francis Warner, a witness for the plaintiff, had a conversation with Hobert, one of the defendants, in the latter part of the winter or first part of the spring of 1861, directly after Burch's trial for divorce, in relation to Burch's solvency, and

told Hobert that Burch had a crank manner of doing business, and that Corning would ruin him. Hobert thought Burch was honest and considered him safe.

On his cross-examination the witness stated that he did not know Burch's reputation as a banker. He was in Chicago about the time of the divorce trial, and there seemed to be a rumor that he would fail or become insolvent after the trial.

The defendants, to sustain the issue on their part, called

*A. L. Rose,* who testified as follows:

Was bookkeeper for I. H. Burch & Co. in May, 1861. They made an assignment on the 3d of June, 1861. They were considered solvent on the 30th May, 1861. There was no bank in Chicago had a better reputation for solvency.

The witness here examined the draft offered in evidence by plaintiff, and states that he knew the draft. It was received by Burch & Co. on the 30th May, 1861, and was that day presented for payment at the office of Neely, Lawrence & Co., drawees, and payment refused by their clerk. (Neely, Lawrence & Co. not being in their office.) On May 31st, it was again presented, and paid.

The letter of E. R. Fay & Co., received by Burch & Co. with the draft, was here shown to the witness, who stated that it was the letter in which the draft was sent; that he was in the habit of seeing the letters of E. R. Fay & Co. The letter was read to the jury as follows:

"Collections made and remitted for at current rates of Exchange

"Exchange Bank of E. R. Fay & Co., Ottawa, Ill., May 29th, 1861.

"Messrs. I. H. BURCH & Co., Chicago,

Dear Sirs: "Inclosed please find for collection and return by express,—

"NEELY, LAWRENCE & Co., $500

"Respectfully yours,

"E. R. FAY & Co.

"The above will be paid in specie, or currency of specie-paying banks."

Never received any other letter from E. R. Fay & Co. with instructions to send by express. The $500 was placed to the credit of E. R. Fay & Co. on our books by mistake, which occurred by the letter being mislaid. If the money had been paid the first time the draft was presented, and on that day, it is probable that the letter would not have been mislaid. It was an error, and was contrary to instructions to place the $500 to the credit of Fay & Co.; the same money should have been sent by express. The draft was paid in notes of the State Bank of Indiana, then at par. On the 30th of May, Fay & Co. had $1,300 in Burch & Co.'s Bank, besides the $500. Fay & Co. have not been paid either of said sums. They were not notified of the collection until the ordinary monthly account current was made out and sent them. It is usual to give notice of collection by return mail; no such notice was sent. The account current was sent after the assignment, and on or about the 6th of June, 1861.

On his cross-examination this witness stated: If the letter had not been mislaid, the money would have been sent by express as ordered. It was known to two or three persons in the bank that Burch was insolvent, some nine or ten days before he failed. He knew of no rumors in Chicago in relation to the condition of Burch & Co. as bankers, prior to their failure, which was a perfect surprise to the business public.

About three weeks before the failure, some persons withdrew their deposits. They were some of the principal business men in Chicago, and the amounts withdrawn were large. The number of depositors who withdrew was not large; but for a few days before the failure there was not anything out of the regular course of business that took place in the bank.

*John Armour* testified: I am a grain dealer at Ottawa and ship to Chicago. The reputation of Burch, prior to his failure, was good. There was no bank in Chicago that sustained a better reputation. There was considerable surprise among business men in Chicago at his failure. I was there about the time.

About that time there was some difficulty in getting the

banks to take drafts for collection on account of the daily fluc-
tuations of currency. Some business men had their funds sent
by express from Chicago. I had no dealings with Burch.

The jury returned a verdict in favor of the plaintiff. The
defendants moved for a new trial, which was refused, and a
judgment was entered in pursuance of the verdict, from which
they took this appeal. The refusal of the court below to grant
a new trial is now assigned for error; it being alleged that the
verdict was against the weight of evidence.

Messrs. GRAY, AVERY & BUSHNELL, for the appellants.

Messrs. LELAND & BLANCHARD, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It is insisted that the finding of the jury is clearly against
the weight of the evidence, and that the court below erred
in not granting a new trial. The witness Fay testified,
that appellants, when first applied to, positively refused to
undertake the collection of the draft. That when they were
applied to a second time for the same purpose, they only
agreed to send the draft forward, upon the condition that
they were to incur no liability. That it was agreed it should
be sent to Burch & Co., for presentation, and when paid, to
be sent to appellants by express. That the draft was thus
sent with these instructions. This evidence stands uncontra-
dicted by any other testimony in the record. It was, however,
attempted to destroy its force, by proving the usual course of
business of this and other banks in Ottawa. And much stress
was placed upon the fact, that when collected, Burch & Co.,
placed the money to the credit of appellants.

If a special agreement was entered into at the time, the
usage of this or other banking houses could not, in the least,
affect the liability of appellants. Proof of usage can only
be received to show the intention or understanding of the
parties in the absence of a special agreement. The parties
have the right to stipulate against the ordinary liabilities of

the business, and appellants did clearly provide by express agreement against any supposed liability growing out of their undertaking. When the draft was sent forward by appellants to Burch & Co., in accordance with the agreement, they became the agents of appellee for the collection of the money. We are unable to see anything in the evidence that overcomes Fay's testimony.

It appears from appellants' letter remitting the draft to Burch & Co., that they gave directions to collect, and at once to send the money by express, as it had been agreed between appellants and appellee.

The clerk of Burch & Co. testified that when the money was collected, it was, by mistake, passed to the credit of appellants, and against their instructions. Nothing can be inferred against appellants, from this act, done without their sanction or consent. And it will be remembered it was not by their agents, but those of the appellee.

It is also urged that appellants were guilty of negligence, in sending the draft to an irresponsible banking house, for collection. The evidence shows that in Chicago, where Burch & Co. did business, their character for solvency was good. It, however, appears that Warner had suspicions of their solvency, and communicated them to appellants; but he states no facts, except that he had heard persons predict that Corning would break Burch in their litigation. It also appears that some depositors withdrew their funds, previous to that time, from Burch & Co.'s banking house. But it does not appear that appellants were aware of the fact, nor that the withdrawal was occasioned by want of confidence in the solvency of Burch & Co. The appellants transacted their business through this banking house, and seem to have had confidence in its solvency. This evidence is not sufficient to establish the liability of the appellants.

It was, lastly, urged that appellants were guilty of negligence, in taking no steps to correct the mistake in passing the money to their credit. It does not appear that they had any notice of the mistake until they heard of the failure. But it is insisted that when the money failed to come by express, they should

have written to have learned the reason,· and that had they done so, the money might have been saved. The draft was received by Burch & Co. on the 30th of May, and it was paid on the next day. On the 3d of June, three days afterwards, Burch & Co. failed, and made an assignment. There was, then, but two days between the collection and the failure, within which to receive the money. Suppose appellants had become apprehensive that something was wrong, by failing to receive the money by express, on the first of June, and had written on the second, does any one suppose the money could have been thus obtained, or information, that would have led to its receipt? It will hardly be contended that because the money was not received on the first of June, appellants should have gone in person, or sent a messenger the next day; and even if they had, it is not probable anything could have been obtained.

We think the verdict is clearly against the evidence, and that the court below erred in refusing to set it aside. The judgment is therefore reversed, and the cause remanded.

*Judgment reversed.*

Mr. Chief Justice Caton concurred.

Mr. Justice Breese dissented.